# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| Latosha Austin, Natasha McIntosh, | § | Case No. 25-cv-272 |
| Roscoe Eldridge, and Debby Worley, | § | |
| individually and on behalf of all | § | |
| others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AT&T, INC., and AT&T | § | |
| MOBILITY, LLC, | § | |
| | | |
| Defendants. | | |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.    Data companies are acutely aware of the critical importance of cybersecurity in an increasingly interconnected world. With the exponential growth of cloud storage, companies are entrusted with sensitive information, ranging from personal details to financial records.

2.    Snowflake Inc. ("Snowflake") is a company that specializes in cloud-storage technologies to warehouse and secure sensitive data, selling data storage, and analytics products to companies such as Defendants AT&T, Inc. and AT&T Mobility, LLC (collectively "AT&T" or "Defendants").

3.    AT&T has also long understood the importance of robust cybersecurity, as discussed herein, to protect the data of its customers, employees, and subscribers.

4.    Information security policies and practices are imperative to ensuring that sensitive information is not exposed to unauthorized third parties. These exposures, commonly referred to as "data breaches" can cause significant harm to individuals—exposing them to fraud and attempted fraud, identity theft, reputational harm, and the continuing risk of harm that results in criminals having their information.

5.    A data breach can result in catastrophic consequences for individuals. As a result, and based upon legal and industry-standard requirements, companies prioritize robust cybersecurity measures.

6.    In this case, however, Defendants did not implement three of the most basic and rudimentary cybersecurity policies to protect Personal Information, including, most prominently, multifactor authentication.[1] The foreseeable result? A data breach. The cybercriminal known as UNC5537 used compromised login credentials for Defendants, plugged them in to its Snowflake account, and successfully exfiltrated Personal Information relating to millions of consumers (the "Data Breach").

7.    UNC5537's success was made possible by basic data security failings on the part of Snowflake and Defendants. These companies collectively flouted relevant governmental guidance, regulations, statutes, and industry standards.

8.    The Data Breach's foreseeable consequences are neither imaginary nor hypothetical: shortly after the Data Breach, sensitive information previously stored with Snowflake began appearing for sale on the dark web.[2] The harm resulting from exposing the information cannot be undone.

---

[1]    "Personal Information," as used herein, refers to that information which was exposed to cybercriminals through the Data Breach. Defendants protected that information behind credentials (i.e., a username and password), intending that it not be exposed to unauthorized third parties. As alleged herein, inadequate, negligent, and reckless cybersecurity practices resulted in that information being exposed.

[2]    Snowflake Breach Threat Actor Offers Data of Cloud Company's Customers, SOCRadar, https://socradar.io/overview-of-the-snowflake-breach/ (last accessed Jan. 13, 2024).

9.    Plaintiffs and Class Members[3] now face the real and actual harm that the Data Breach has caused them and will continue to cause them. Not only have cybercriminals obtained valuable and sensitive Personal Information about them, but that information has been obtained by other criminals, and offered for resale to still more criminals. As a result, Plaintiffs and Class Members have already experienced fraud or potential fraud, an invasion of their privacy, time and expenses spent mitigating the imminent and substantial risk of data misuse, and are at significant risk of identity theft, reputational harm, and other injuries.

10.    Defendants bear responsibility for their role in the Data Breach. Despite their experience and sophistication, Defendants were negligent (at best) and reckless (at worst) for failing to implement basic and routinely required cybersecurity practices to protect Plaintiffs' and Class Members' Personal Information.

## **PARTIES**

11.    **AT&T, Inc.** is a telecommunications company incorporated under Delaware law, with its principal place of business located at 208 S. Akard Street, Dallas, Texas.[4] AT&T has agreements with Mobile Virtual Network Operators

---

[3]    "Class Members" refers to those individuals who were impacted by the Data Breach, as alleged herein.

[4]    AT&T Inc. Annual Report (Form 10-K) (Feb. 23, 2024) ("AT&T 2024 Form 10-K"),   Quarterly Report (Form 10-Q) (Oct. 29, 2024). https://otp.tools.investis.com/clients/us/atnt2/sec/sec-show.aspx?Type=html&FilingId=17303532&Cik=0000732717.

("MVNOs") such as Boost Mobile and Consumer Cellular under which the MVNOs pay to use AT&T's network infrastructure.

12. **AT&T Mobility, LLC** is a telecommunications company, which is a wholly owned subsidiary of AT&T, Inc.[5] AT&T Mobility, LLC is a Delaware limited liability company, with its principal place of business located at 1025 Lenox Park Blvd. NE, Atlanta, Georgia.[6]

13. **Plaintiff Latosha Austin** is a citizen of California residing in Fresno. Plaintiff Austin is a current AT&T customer and has been a customer since 2000. Plaintiff Austin was also a customer of Cricket Wireless in or around 1999-2000. Plaintiff Austin received correspondence from AT&T in or around June 2024.

14. As a result of the Data Breach, Plaintiff Austin has suffered injury and damages.

15. **Plaintiff Natasha McIntosh** is a citizen of Alabama residing in Brockton. Plaintiff McIntosh was a customer of Boost Mobile from 2002 to 2022 and was an employee of Boost Mobile for a year, starting around 2003. She provided Boost Mobile with at least her name, SSN, email, and payment card information.

---

[5] *Id.* at 1.

[6] AT&T Mobility, LLC, *Annual Registration*, Ga. Corps. Div., https://ecorp.sos.ga.gov/BusinessSearch/DownloadFile?filingNo=26582594.

16.    Boost Mobile is an MVNO of AT&T and its customers, like Plaintiff McIntosh, suffered from the Data Breach in part as a result of Boost Mobile's use of AT&T's network. As a result of the Data Breach, Plaintiff McIntosh has suffered injury and damages.

17.    **Plaintiff Roscoe Eldridge** is a citizen of Illinois residing in South Beloit. Plaintiff Eldridge is not a customer of AT&T, Cricket Wireless, or AT&T's MVNOs. He does frequently communicate with individuals who use those phone carriers, however, and did so throughout 2022. For example, his daughter has had a Cricket Wireless account for over a decade, and he was in frequent contact with her through phone calls and texts throughout 2022.

18.    As a result of the Data Breach, Plaintiff Eldridge has suffered injury and damages.

19.    **Plaintiff Debby Worley** is a citizen of New Jersey residing in Clifton. Plaintiff Worley has been a Boost Mobile customer for approximately two to three years.  Boost Mobile is an MVNO of AT&T and its customers, like Plaintiff Worley, suffered from the Data Breach in part as a result of Boost Mobile's use of AT&T's network.

20.    Plaintiff Worley received a notice letter from Boost Mobile dated November 18, 2024. Since the Data Breach, Plaintiff Worley has experienced an

increase in spam and scam phone calls probing her for information. As a result of the Data Breach, Plaintiff Worley has suffered injury and damages.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiffs are citizens of states different from Defendant.

22.    This Court has personal jurisdiction over AT&T, Inc. because its principal place of business is located in Dallas, Texas.

23.    Venue properly lies in this judicial district because, it is the district in which Defendants have the most significant contacts, including AT&T, Inc.'s principal place of business.

## FACTUAL ALLEGATIONS

24.    Snowflake is one of the largest data storage providers in the United States and it contracts with thousands of organizations around the world to securely store their consumer and employee data on its "Data Cloud" platform.[7] Snowflake's

---

[7]    Snowflake, *How It All Started*, https://www.snowflake.com/en/company/overview/about-snowflake/ (last visited Jan. 6, 2025).

platform is a product and a service that provides companies like Defendants the ability to store, process, and analyze large volumes of consumer and employee data.[8]

25.    Snowflake's services are typically referred to as "Software as a Service" (SaaS), which refers to Snowflake's software that allows its customers to connect to cloud-based applications over the internet.

26.    Defendants are Snowflake customers and they store consumer and/or employee Personal Information on the Data Cloud.

27.    Defendants "provides more than 100 million U.S. consumers with communications experiences across mobile and broadband."[9]

28.    AT&T admits that it is their "duty under federal law to protect the confidentiality of" the call records information AT&T collects, including Personal Information.[10] This is true: 47 U.S.C. § 222 (Privacy of customer information) imposes a duty on AT&T to protect the confidentiality of customer proprietary network information and is prohibited from disclosure, except as required by law or with the customer's permission.

---

[8]    Snowflake, *The Snowflake Platform*, https://www.snowflake.com/en/data-cloud/platform/ (last visited Jan. 6, 2025).

[9]    AT&T, Investor Profile, https://investors.att.com/investor-profile (last visited Aug. 19, 2024).

[10]    AT&T Privacy Notice (effective date December 11, 2023 through July 16, 2024), https://web.archive.org/web/20231212012645/https://about.att.com/privacy/privacy-notice.html.

29.    AT&T claims they maintain "a network and information security program that is reasonably designed to protect our information, and that of our customers, from unauthorized risks to their confidentiality, integrity, or availability."[11]

30.    When disclosing the Data Breach, AT&T reaffirmed their promises that: "We hold ourselves to a high standard and commit to delivering the experience that you deserve. We constantly evaluate and enhance our security to address changing cybersecurity threats and work to create a secure environment for you. We invest in our network's security using a broad array of resources including people, capital, and innovative technology advancements."[12]

31.    AT&T owed a duty of care to Plaintiffs and Class Members. As a condition of providing telecommunication services, including allowing their customers to call and text non-AT&T customers, and allowing non-AT&T customers to call and text AT&T customers, AT&T collected, stored, shared, and maintained Plaintiffs' and Class Members' Personal Information, including on the Snowflake cloud-based data storage systems involved in the Data Breach.

---

[11]    AT&T Inc., 2023 Annual Report, https://investors.att.com/financial-reports/annual-reports/2023 (last visited Aug. 20, 2024).

[12]    *Unlawful access of customer data*, AT&T (July 24, 2024), https://www.att.com/support/article/myaccount/000102979?source=EPcc000000000000U  (last visited Aug. 19, 2024).

32.    AT&T shared Plaintiffs' and Class members' Personal Information with Snowflake in the course of using services provided by Snowflake.

33.    AT&T, in collecting such sensitive Personal Information from consumers, owed a duty of care to consumers, including Plaintiffs, to exercise reasonable care in maintaining, protecting, and securing their Personal Information. AT&T, by mandating the receipt of sensitive Personal Information from consumers as a condition of purchasing goods and services, implied their assent to consumers to protect their Personal Information. Consumers expected AT&T and to protect their Personal Information when they provided it as a condition to procure goods and services. AT&T owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in Snowflake's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

34.    AT&T owed a common law duty to Plaintiffs and Class Members to supervise Snowflake in the collection, storage, and security of Plaintiffs' and Class Members' Personal Information.

35.    AT&T's duty of reasonable care is established by federal statute, governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms, as described herein.

36.    AT&T also owed a statutorily imposed duty to Plaintiffs and Class Members to refrain from unfair and deceptive practices.

37.    AT&T owed a statutorily imposed duty, pursuant to 47 U.S.C § 222, to safeguard customer information against unauthorized disclosure—such as the Data Breach.

38.    AT&T knew of the importance of implementing basic cybersecurity, as well as exercising oversight over third-party providers for several reasons.

39.    First, AT&T is credited as having invented MFA three decades ago, holding a patent for a "transaction authorization and alert system" that allowed customers to authorize transactions through the use of a messaging or alert system.[13]

40.    Second, AT&T advertises MFA products to its business clients for purchase, noting that using MFA could stave off data breaches. "The majority of data breaches are caused by brute force attacks on credentials. . . . AT&T Multi-Factor Authenticator (AT&T MFA) uses next generation security protocols available to protect your network and devices from breaches related to identity. Cybercriminals use automated code breaking brute force attacks to infiltrate a

---

[13]    AT&T Corp., Transaction authorization and alert system, P0745961 (A2), https://worldwide.espacenet.com/publicationDetails/biblio?DB=worldwide.espacenet.com&II=0&ND=3&adjacent=true&locale=en_EP&FT=D&date=19961204&CC=EP&NR=0745961A2&KC=A2; Jon Brodkin, *Kim Dotcom claims he invented two-factor authentication—but he wasn't the first*, ArsTechnica (May 23, 2013), https://arstechnica.com/information-technology/2013/05/kim-dotcom-claims-he-invented-two-factor-authentication-but-he-wasnt-first/.

network, steal passwords, and steal or ransom your data or your customers' data. It's more difficult and costly to clean up after an attack than to prevent it in the first place. To stay ahead on security, it's a smart move to invest in a virtually unphishable credential authentication system."[14]

41.    Third, AT&T has suffered several data breaches, demonstrating to the company that a failure to implement and follow cybersecurity guidelines can result in the exposure of customer data.[15]

42.    The Data Breach is the second breach of AT&T customer data in 2024. Earlier in 2024, data of over 70 million AT&T customers—including encrypted passcodes for accessing AT&T customer accounts—was published on a cybercrime forum. AT&T confirmed the data was authentic, but does not know whether the data originated from AT&T or one of its vendors.[16] The breached data includes names, phone numbers, postal addresses, and Social Security numbers.[17] Based on AT&T's preliminary analysis, the data appears to be from 2019 or earlier, impacting

---

[14]    *Secure access to your corporate network and prevent identity fraud with AT&T Multi-Factor Authenticator* (2022), https://cdn-cybersecurity.att.com/docs/product-briefs/att-multi-factor-authenticator.pdf.

[15]    Catherine Reed, *AT&T Data Breaches: Full Timeline Through 2023*, Firewall Times (Oct. 5, 2023), https://firewalltimes.com/att-data-breaches/.

[16]    Becky Bracken, *AT&T Confirms 73M Customers Affected in Data Leak*, DarkReading (Apr. 1, 2024), https://www.darkreading.com/remote-workforce/att-confirms-73m-customers-affected-data-leak; AT&T Inc., *AT&T Addresses Recent Data Set Released on the Dark Web* (Mar. 30, 2024), https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last visited Aug. 20, 2024).

[17]    *Id.*

approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.[18] AT&T claims there is no evidence this was the result of unauthorized access to its systems.[19]

43.    In the last ten years, AT&T was also the subject of several additional data breaches involving customer data in 2014, 2020, 2022, and 2023.[20]

44.    Companies with such extensive experience in prior breaches should understand and appreciate the significant risk of harm that breaches expose customers to. AT&T knew or were reckless in not knowing that substandard data security practices or ineffective monitoring of third-party providers could—and often do—lead to data breaches.

45.    This Data Breach was foreseeable because AT&T has dealt with data breaches involving third-party vendors in the past.

## I.    AT&T breached its duty to protect Personal Information and engaged in unfair trade practices.

46.    Despite AT&T's explicit assurances that they would safeguard their customers' sensitive Personal Information, AT&T notified customers that customer information was "illegally downloaded" from their Snowflake cloud platforms.

---

[18]    *Id*.

[19]    *Id*.

[20] Catherine Reed, *AT&T Data Breaches: Full Timeline Through 2023*, Firewall Times (Oct. 5, 2023), https://firewalltimes.com/att-data-breaches/ (last visited Aug. 20, 2024).

47.     Information exposed in the Data Breach not only constituted sensitive call logs for AT&T customers, but it also disclosed with whom those customers interacted (regardless of service provider), call logs for individuals whose numbers are on customer accounts, and former customers.

48.     The Data Breach accordingly exposed the Personal Information of nearly every person in the United States with a cell phone number.

49.     The compromised information is uniquely sensitive. For example, cell site identification numbers can be used to determine the approximate location of where a call was made or text message sent. Cybercriminals can also now identify relationships among phone numbers, allowing hackers to make scams more believable. With the compromised Personal Information, hackers can determine which banks, medical providers, schools, charities, stores, and other individuals a person is in contact with, further expanding the range and effectiveness of phishing and other attempts to trick impacted individuals into giving up yet more personal or financial information.[21]

50.     AT&T's announcements of the Data Breach did not include a critical piece of information: hackers could not have "illegally downloaded" information

---

[21]     Ramishah Maruf, *How AT&T customers can protect themselves in the latest data breach*, CNN (July 12, 2024), https://www.cnn.com/2024/07/12/business/att-customers-data-breach-protection/index.html.

about customers had AT&T deployed basic cybersecurity measures their Snowflake accounts.

51.     Additionally shocking is that, although AT&T learned of the Data Breach on April 19, 2024, hackers were still able to continue exfiltrating data on their customers until April 25, 2024.[22]

52.     At the time of the Data Breach, AT&T failed to maintain reasonable data security measures and comply with FTC guidance, the PCI DSS, and other relevant industry standards summarized above. These data security failings included:

- AT&T did not enforce MFA for its Snowflake accounts.

- AT&T did not rotate or disable the credentials of old Snowflake accounts.

- AT&T did not implement network allow lists that limited Snowflake account access to certain locations or trusted users.

53.     AT&T failed to take these measures despite being under constant attacks and attempted attacks from threat actors.

54.     AT&T's data security failings enabled the Data Breach. Without these basic protections, UNC5537 was able to exfiltrate the Personal Information of millions of consumers with nothing more than stolen AT&T or Snowflake credentials.

---

[22]     Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, Wired (Jul. 12, 2024), https://www.wired.com/story/att-phone-records-breach-110-million/.

55.    Indeed, each of these basic protections could have prevented the Data Breach. For example:

- Had AT&T implemented MFA, UNC5537 would not have been able to access AT&T data with stolen or outdated credentials. MFA would have required an additional layer of authentication (i.e., a code sent via text message or email) that UNC5537 would not have had access to.

- AT&T could have also prevented the Data Breach by maintaining a policy of rotating or disabling credentials that were either old or compromised in other data breaches. As the Mandiant Report found that a "majority of the credentials used by UNC5537" were available from historic malware campaigns dating back to 2020, a policy that disabled previously-compromised credentials could have prevented the Data Breach.[23]

- AT&T could have also prevented the Data Breach by maintaining stricter network allow lists that restricted access to customer Personal Information to certain locations or trusted user accounts that were not previously compromised.

56.    AT&T, through these basic data security failings, breached express representations to consumers regarding protecting Personal Information and implementing cybersecurity policies. In the alternative, AT&T breached implied commitments to protect consumer Personal Information made to consumers by virtue of having access to some of the most sensitive data available to hackers and opting to simply not protect it.

---

[23]    The Mandiant Report, *supra*.

16

57.     AT&T's basic data security failings also breached their duty of care to protect the Personal Information of consumers.

## II.     Personal Information stolen about Plaintiffs and Class Members.

58.     In a July 12, 2024 press release, AT&T acknowledged that "customer data was illegally downloaded from our workspace on a third-party cloud platform." The press release, excerpted at greater length below, disclosed that the stolen data included "AT&T records of calls and texts of nearly all of AT&T's cellular customers . . . between May 1, 2022 – October 31, 2022" and also included for a subset of stolen records, "one or more cell site identification number(s) associated with the [telecommunications] interaction." [24]

> Based on our investigation, the compromised data includes files containing **AT&T records of calls and texts of nearly all of AT&T's cellular customers**, customers of mobile virtual network operators (MVNOs) using AT&T's wireless network, as well as AT&T's landline customers who interacted with those cellular numbers between May 1, 2022 - October 31, 2022. The compromised data also includes records from January 2, 2023, for a very small number of customers. The records identify the telephone numbers an AT&T or MVNO cellular number interacted with during these periods. For a subset of records, one or more cell site identification number(s) associated with the interactions are also included.

---

[24]     *AT&T Addresses Illegal Download of Customer Data*, AT&T (July 12, 2024), https://about.att.com/story/2024/addressing-illegal-download.html.

59.    The scale of this breach is enormous. Based on AT&T's annual report of its total customers in 2022 and its disclosure that "nearly all" were affected, the Data Breach impacted over 100 million customers.[25]

60.    An individual's call and text logs are private and sensitive information. Indeed, Congress made these precise findings when it passed the Telephone Records and Privacy Protection Act of 2006 ("TRPPA"), which criminalized the unauthorized disclosure of phone records.[26] In passing the TRPPA, Congress made express findings that "telephone records can be of great use to criminals because the information contained in call logs may include a wealth of personal data"; that "call logs may reveal the names of telephone users' doctors, public and private relationships, business associates, and more" and that "the unauthorized disclosure of telephone records not only assaults individual privacy but, in some instances, may further acts of domestic violence or stalking, compromise the personal safety of law enforcement officers, their families, victims of crime, witnesses, or confidential informants, and undermine the integrity of law enforcement investigations."[27]

61.    Further demonstrating how an individual's call logs can disclose private relationships and connections, after the Data Breach, FBI officials warned its

[25]    Matt Kapko, *Massive Snowflake-linked attack exposes data on nearly 110M AT&T customers*, Cybersecurity Dive (July 12, 2024), https://www.cybersecuritydive.com/news/att-cyberattack-snowflake-environment/721235/.

[26]    Telephone Records and Privacy Protection Act of 2006, 18 U.S.C. § 1039.

[27]    18 U.S.C. § 1039, Notes 1-2, 5.

agents that their call logs presumed stolen and that the identity of confidential informants could be compromised. The FBI urged agents to take action to limit the fallout given the possibility of hackers publicly disclosing the stolen call logs.[28]

62.    Industry experts have highlighted additional serious privacy and fraud concerns associated with the theft of call logs and cell cite identification numbers:

> There are many effects of this breach. If someone gets their hands on this much info, they could use it in a lot of bad ways. This information could be used by cybercriminals to target phishing attacks, steal your name, or even demand money. Cybercriminals can make more effective phishing schemes if they know specific details about people, like their phone numbers and how often they call. The data could also be used to figure out personal things about people, like their relationships, health, or finances, which could then be used for bad things.[29]

63.    Security experts warn that the information can expose consumers to significant harm and fraud.

> "Yeah, this is really bad," says Jake Williams, vice president of research and development at the cybersecurity consultancy Hunter Strategy. "What the threat actors stole here are essentially call data records. These are a gold mine in intelligence analysis because they allow someone to understand networks—who is talking to whom and when. And threat actors have data from previous compromises to map phone numbers to identities. But even without identifying data for a

---

[28]    Jake Bleiberg and Margi Murphy, *FBI Warned Agents It Believes Phone Logs Hacked Last Year*, Bloomberg (Jan. 16, 2025), https://www.bloomberg.com/news/articles/2025-01-16/fbi-has-warned-agents-it-believes-hackers-stole-their-call-logs
[29]    Elena Thomas, *Exposed in Massive Cyber Attack*, Cyber Defense Magazine (Jan. 8, 2025), https://www.cyberdefensemagazine.com/att-breach-2024-customer-data-exposed-in-massive-cyber-attack/.

phone number, closed networks—where numbers *only* communicate with others in the same network—are almost always interesting."[30]

64.    Defendants' conduct has created a substantial risk of identity theft, fraud, or other forms of exploitation. The data acquired in the Data Breach included unencrypted phone numbers and cell site identification numbers, which can be used to perpetuate fraud, identity theft, and other types of exploitation. For example, this data can be used in SIM swapping scams, port-out fraud,[31] and Smishing attacks.[32]

65.    Telephone numbers also carry a "treasure trove of information that can be harnessed for various purposes."[33] Even "imprecise and sparse telephone metadata" could allow a cybercriminal to infer a person's home location.[34]

66.    While the Personal Information stolen in the Data Breach does not include customer names, AT&T themselves admitted, in disclosing the Data Breach, that "there are often ways, using publicly available online tools, to find the name

---

[30]    Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, Wired (Jul. 12, 2024), https://www.wired.com/story/att-phone-records-breach-110-million/.
[31]    Andrew Regitsky, *FCC Will Update CPNI Rules to Stop Data Breaches*, CCMI, https://www.ccmi.com/fcc-will-update-cpni-rules-to-stop-data-breaches/ (last visited Aug. 20, 2024).
[32]    Fed. Commc'n Comm., Avoid the Temptation of Smishing Scams (Feb. 1, 2024), https://www.fcc.gov/avoid-temptation-smishing-scams (last visited Aug. 20, 2024).
[33]    Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).
[34]    *Id.*

associated with a specific telephone number."[35] Once you have a name, the stolen data can then be used to "identify key relationships, pinpoint vulnerabilities, and craft highly sophisticated attacks"[36]

67.     Telephone numbers, even when anonymized, are "trivially reidentifiable" through methods such as basic web searches.[37]

68.     Telephone metadata such as that involved in the Data Breach also enables cybercriminals to determine sensitive traits and characteristics of Plaintiff and Class members, such as potential medical conditions, relationship status, religious affiliation, or firearm ownership.[38]

69.     The potential exposure of this information is particularly alarming, according to Secure Cyber Defense CEO Shawn Waldman, because this type of data allows hackers to pinpoint locations based on phone numbers.[39] Jake Williams, a former hacker for the National Security Agency, said call data records "are a gold mine in intelligence analysis because they can be used to understand who is talking

---

[35]     AT&T, Form 8-K (July 12, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/000073271724000046/t-0240506.htm.

[36]     Jonathan Grieg, *AT&T reportedly paid ransom for deletion of stolen call logs after culprit allegedly detained*, The Record (July 15, 2024), https://therecord.media/att-ransom-data-breach (last visited Aug. 20, 2024).

[37]     Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).

[38]     *Id*. at 5539-40.

[39]     Stephanie Schappert, *AT&T reports arrest made in April hack, updates affected customers*, cybernews (July 18, 2024), https://cybernews.com/news/att-breach-hack-reports-arrest-made/ (last visited Aug. 20, 2024).

to who—and when."[40] This type of information can be used to craft highly sophisticated attacks. It can also be used to circumvent SMS-based multifactor authentication security measures.

70.    The potential for triangulation of customers' locations from compromised cell site identification numbers further "adds a physical dimension to the already extensive privacy violation and could expose individuals to highly targeted and convincing social engineering attacks, not to mention compromising [their] physical security…."[41]

71.    Thus, even without contents of communications, the compromised metadata has "major implications for people's privacy and security."[42]

72.    Exacerbating the risk of identity theft to Plaintiffs and Class Members, cybercriminals connected with the Data Breach have advertised and sold the stolen Personal Information on dark web forums.[43]

---

[40]    Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[41]    Nate Nelson, *AT&T Breach May Also Impact Millions of Boost, Cricket, H2O Customers*, DarkReading (July 12, 2024), https://www.darkreading.com/cyberattacks-data-breaches/att-breach-may-also-impact-millions-of-boost-cricket-h2o-customers (last visited Aug. 21, 2024).

[42]    Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[43]    Jessica Lyons, *US Army soldier who allegedly stole Trump's AT&T call logs arrested*, The Register (Jan. 1, 2025), https://www.msn.com/en-us/news/crime/us-army-soldier-who-allegedly-stole-trumps-at-t-call-logs-arrested/ar-AA1wNlhv.

III.    **Plaintiffs and Class Members suffered injuries as a result of the Data Breach.**

73.    As described herein, the Personal Information exposed in the Data Breach caused injury to Plaintiffs and Class Members.

74.    First, the Data Breach subjected Plaintiffs and Class Members to a substantial risk of identity theft as demonstrated by facts including, but not limited to, incidences of identity fraud suffered by the Plaintiffs, the posting of Plaintiffs' and Class Members' Personal Information on the dark web, the sensitivity of Personal Information related to call log and location data, and AT&T's own Notice that directs customers to a website called CyberAware for customers to "[f]ind more tips and info" about how to protect themselves after the Data Breach, which includes tutorials for customers to protect against identity theft, phishing, and other fraudulent schemes.[44] As a result of this substantial risk, Plaintiffs and Class Members reasonably suffered injury in the form of lost time and resources mitigating against the risk of identity theft and emotional distress arising from the risk of identity theft.

75.    Second, Personal Information has inherent value, and the exposure of that information makes consumers susceptible to fraud and scams for years into the future. Not only should consumers be compensated for the value of their Personal

---

[44]    *Unlawful access of customer data*, AT&T, https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U; *CyberAware*, https://about.att.com/pages/cyberaware (last accessed Jan. 17, 2025).

Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

76.    Third, the disclosure of Plaintiffs' and Class Members' private and sensitive nature of the Personal Information to cybercriminals who in turn advertised and sold the Personal Information on the dark web, constitutes a privacy injury.

## CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action on their own behalf, and on behalf of the following Class and Subclasses:

- **Nationwide AT&T Class.** All individuals residing in the United States who AT&T identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "AT&T Class").

- **Nationwide Cricket Wireless Class.** All individuals residing in the United States who Cricket Wireless identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "Cricket Wireless Class").

- **Nationwide Non-Customer AT&T Class.** All individuals residing in the United States who either: (a) have been identified as being among those individuals whose Personal Information was compromised in the Data Breach by a mobile virtual network operators ("MVNO") not affiliated with AT&T, including but not limited to Consumer Cellular and Boost Mobile; or (b) exchanged communications with an AT&T or its MVNO customers between May 1, 2022, and October 21, 2022. Excluded from this Class are current AT&T customers (the "AT&T Non-Customer Class").

- **State-Specific Subclasses.** As described in this Section below, all individuals residing in a specific state who AT&T and/or MVNOs identified as being among those individuals whose Personal Information was compromised in the Data Breach ("AT&T Subclass").

24

78.    Excluded from the AT&T Classes are AT&T and impacted MVNO officers and directors, any entity in which AT&T or impacted MVNOs have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of AT&T or impacted MVNOs. Excluded also from the AT&T Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

79.    Plaintiffs reserve the right to amend or modify the definition of the Classes or create additional subclasses as this case progresses.

80.    **Numerosity.** The members of the AT&T Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that over hundreds of millions of individuals were affected by the Data Breach.

81.    **Commonality.** There are questions of fact and law common to the AT&T Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether AT&T had a duty to protect the Personal Information of Plaintiffs and Class Members.

- Whether AT&T breached express or implied commitments to protect the Personal Information of Plaintiffs and Class Members.

- Whether AT&T knew or should have known that their data security practices were deficient.

- Whether AT&T's data security systems were consistent with industry standards prior to the Data Breach.

- Whether AT&T adequately disclosed details regarding the Data Breach to affected consumers.

- Whether AT&T unlawfully utilized, retained, misplaced, or exposed Plaintiffs' and the Class Members' Personal Information.

- Whether Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, general damages, nominal damages, and/or injunctive relief.

82.    **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach.

83.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interest of the Class members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

84.    **Predominance.** AT&T has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the data of Plaintiff and Class Members were stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from AT&T's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

85.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the AT&T Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or

piecemeal litigation. Absent a class action, most AT&T Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual AT&T Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for AT&T. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each AT&T Class Member.

86.    **Injunctive Relief.** AT&T has acted on grounds that apply generally to the AT&T Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a classwide basis.

87.    **Issue Certification.** Likewise, certain issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such issues include, but are not limited to:

- Whether Defendants owed a legal duty to Plaintiffs and Class members to protect their Personal Information.

- Whether Defendants' data security measures were inadequate in light of applicable regulations and industry standards.

- Whether Defendants' data security measures were negligent.

- Whether Defendants breached express or implied representations to the Plaintiffs and Class Members regarding the protection of their Personal Information.

88.    **Identification of Class Members via Objective Criteria**. Finally, all members of the proposed AT&T Classes are readily identifiable using objective criteria. AT&T has access to the names and contact information of Class Members affected by the Data Breach. Adequate notice can be given to Class members directly using information maintained in Defendants' records.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Negligence**
*On behalf of the Plaintiffs and the*
*Nationwide AT&T Class, Cricket Class and Non-Customer AT&T Class*

89.    Plaintiffs repeat and re-allege the allegations contained above, as though set forth fully herein.

90.    AT&T owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information in their possession from being compromised, stolen, or misused by unauthorized persons.

91.    As described herein, AT&T had a duty to: (a) implement industry standard data security safeguards to protect the Personal Information of Plaintiffs and Class Members such as MFA, rotating credentials, and restricting access privileges; (b) maintain, test, and monitor AT&T's security systems to ensure that Personal Information was adequately secured and protected; (c) timely act upon warnings and alerts to respond to intrusions; and (d) adequately notify the Plaintiffs

and Class Members about the types of data that were compromised in the Data Breach.

92.    AT&T's duty to use reasonable care arose from several sources, including those set out below.

93.    AT&T had a common law duty to prevent foreseeable harm to others. The harm was foreseeable because AT&T had and continued to sustain a number of data breaches, exposing sensitive information. AT&T understands that the exposure of Personal Information can affect individuals' lives for years.

94.    This duty existed because AT&T collected and stored valuable Personal Information that is routinely targeted by cyber criminals without putting adequate safeguards into place.

95.    AT&T breached their duties owed to the Plaintiffs and Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

96.    AT&T breached their duties owed to Plaintiffs and Class Members by failing to exercise reasonable oversight in the selection of Snowflake to store Personal Information. Such reasonable oversight would have revealed that Snowflake's cloud services lacked industry standard data security safeguards necessary to adequately protect Personal Information.

97.    The Data Breach was entirely foreseeable. Not only did industry experience show that a failure to adopt the security standards as described herein has resulted in data breaches in the past, but AT&T, themselves, experienced a prior breach of a third-party provider, after not exercising sufficient oversight over that entity.

98.    But for AT&T's negligence, the Personal Information of the Plaintiffs and Class Members would not have been stolen by cybercriminals in the Data Breach.

99.    As a direct and proximate result of AT&T's breach of duties, the Plaintiffs and Class Members have suffered injuries detailed herein.

100.    As a direct and proximate result of AT&T's negligence, the Plaintiffs and Class Members are entitled to damages, including compensatory, general, nominal, and/or punitive damages, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Violation of Applicable State Consumer Protection Laws
*On behalf of Plaintiffs and the Class*

101.    Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

102.    Consumer protection statutes exist to ensure that consumers are protected from unfair, deceptive, and unlawful practices.

103.    Plaintiffs are "consumers" based upon appliable state consumer protection statutes, and those statutes were enacted to ensure that Defendants did not engage in unfair, deceptive, and unlawful practices while engaging in trade or commerce.

104.    Defendants' conduct offends public policy.

105.    As a direct and proximate result of Defendants' unfair trade practices, Plaintiffs and Class Members are entitled to injunctive relief, damages, including actual damages in an amount to be proven at trial or statutory damages, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees, as applicable under various consumer protection statutes.

106.    This cause of action will be amended prior to trial based upon discovery and choice of law.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL CLAIMS FOR RELIEF

107.    Plaintiffs have asserted claims in this complaint in order to confer subject matter jurisdiction over Defendants so that this case may be transferred to the District of Montana by the Judicial Panel on Multidistrict Litigation.

108.    To the extent this case is transferred back to this Court for trial, Plaintiffs reserve the right to assert additional causes of action or amend their causes of action as applicable and based upon discovery and motion practice in the MDL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes set forth herein, respectfully request the following relief:

A.      That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are the proper class representatives; and appoint Plaintiff's counsel as Class Counsel;

B.      That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiffs and Class Members compensatory, consequential, general, and/or nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.      That the Court award punitive or exemplary damages, to the extent permitted by law;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

F.      That Plaintiff be granted the declaratory and injunctive relief to prevent further injuries from manifesting as alleged herein;

G.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.     That the Court award pre-and post-judgment interest at the maximum

legal rate and all such other relief as it deems just and proper; and

I.     Any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.


Dated: February 3, 2025                     Respectfully submitted by:

                                            */s/ Shana Khader*
                                            Shana Khader
                                            Texas Bar No. 24099860
                                            **TYCKO & ZAVAREEI, LLP**
                                            2000 Pennsylvania Avenue, NW
                                            Suite 1010
                                            Washington, DC 20006
                                            Tel. (202) 973-0900
                                            skhader@tzlegal.com

                                            Jason S. Rathod
                                            **Migliaccio & Rathod LLP**
                                            412 H St NE, Suite 302
                                            Washington DC 20002
                                            Tel. 202.470.3520
                                            jrathod@classlawdc.com

                                            John Heenan
                                            **Heenan & Cook**
                                            1631 Zimmerman Trail
                                            Billings, MT 59102
                                            Tel. 406.839.9091
                                            john@lawmontana.com

                                            Amy Keller
                                            **DiCello Levitt LLP**

Ten North Dearborn, Sixth Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com

J. Devlan Geddes
**Goetz, Geddes & Gardner P.C.**
35 N. Grand Ave.
Bozeman, MT 59715
Tel. 406.587.0618
devlan@goetzlawfirm.com

Raphael Graybill
**Graybill Law Firm, PC**
300 4th Street North
Great Falls, MT 59401
Tel. 406.452.8566
raph@graybilllawfirm.com

*Counsel for Plaintiffs and the Putative
Class*